**18-6185-MPK**

## AFFIDAVIT OF MICHAEL LANE

I, Michael Lane, a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration, being duly sworn, depose and state as follows:

### INTRODUCTION

1.    I am a Detective for the Andover, MA Police Department.  I am a graduate of 1998 MPOC Lowell Police Academy and have been a Police Officer in Massachusetts since June 1, 1998.  I am presently assigned to the Drug Enforcement Administration Cross Borders Initiative Drug Task Force located in Lowell, MA.  During the course of my employment with the Andover Police Department and with the DEA, I have received training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities. In addition to my training, I have had experience in the investigation of the activities of narcotics traffickers.   I have participated in a number of narcotics investigations as a case agent and in subsidiary roles.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.  I personally have participated in almost all aspects of narcotics trafficking investigations, including but not limited to conducting surveillance (both physical and electronic), using confidential informants, performing undercover purchases, and executing arrest and search warrants.   These investigations involved but were not limited to the following controlled substances: Heroin, Fentanyl, Cocaine, Marijuana, LSD, Methamphetamine and Ecstasy.  These investigations have resulted in arrests, convictions, and seizures of controlled substances, related paraphernalia, automobiles, and U.S.

currency from the proceeds of the distribution of controlled substances.  More specifically, I

have made hundreds of arrests for violations of the Controlled Substances Act, and I have

testified in Superior and District courts throughout the Commonwealth and Federal Court in the

District of Massachusetts.

2.      As a DEA TFO, I am authorized to investigate violations of the laws of the United

States, including violations of the federal drug laws in Title 21 of the United States Code.  I am a

"federal law enforcement officer" as defined by Federal Rule of Criminal Procedure 41(a)(2)(C),

that is, a government agent engaged in enforcing the criminal laws and duly authorized by the

Attorney General to request a search warrant.

3.      Since my assignment to the DEA, Cross Borders Initiative Task Force, I have

become familiar with, and have utilized, many of the so-called "normal investigative procedures"

used by law enforcement officers to identify, apprehend, and successfully prosecute persons

involved in the distribution of controlled substances.  These "normal investigative procedures"

include, but are not limited to: physical surveillance, telephone toll analysis, public records

analysis, interviews, gathering information from informants, "controlled purchases" of drugs,

utilizing undercover police officers to infiltrate drug distribution organizations, trash analysis,

executing search warrants and grand jury investigations.

4.      In the course of my official duties as a police officer, I have interviewed many

defendants, informants and suspects who were users, sellers and distributors of controlled

substances, and I have participated in the authorized electronic interception of conversations

between such persons.  On the basis of my training and experience, I am familiar with the

vernacular of illegal narcotics abusers and distributors.  I am acquainted with the methods by

which such persons seek to disguise the subject of their conversations and operations, and I am

familiar with the full range of methods, practices and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

5.      I am submitting this affidavit in support of an application for the issuance of a search warrant authorizing the search of the following vehicle: a red 2001 Mercedes C240 with MA registration 9BWY10, registered to Carlos RODRIGUEZ of 20 Canton Street, Lawrence, MA (hereinafter, the "Target Vehicle"). The Target Vehicle is currently in the custody of the DEA at Sheehan's Towing at 9 Merrimack Street, Lawrence, MA. A complete description of the vehicle to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

6.      As will be explained more fully below, on April 19, 2018, RODRIGUEZ and Carlos Torres, (hereinafter, "Torres") worked together to procure 50 grams of fentanyl to sell to a confidential informant. After further investigation on April 19, 2018, approximately 150 grams of fentanyl were seized from RODRIGUEZ as he exited the Target Vehicle.

7.      As a result and as will be discussed below, I submit that there is probable cause to believe that the Target Vehicle contains drugs, records, and other evidence of the following offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as set forth in Attachment B, will be located in the vehicle to be searched, as described in Attachment A.

8.      I have personally participated in the investigation of RODRIGUEZ since March 2018 and the investigation of Torres since April 19, 2018.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

9.      Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that evidence of criminal activity involving the Target Offenses is located in the Target Vehicle, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested search warrant.  Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested warrant.  Nor do I request that this Court rely on any facts not set forth herein in reviewing these applications.

## PROBABLE CAUSE

### A.  Undercover Purchases of Heroin and Fentanyl from Kristina Mena and RODRIGUEZ

10.      In March 2018, DEA investigators and Andover Police officers began an investigation into distribution of fentanyl in the Andover and Lawrence areas. On March 12, 2018, an undercover police officer (hereinafter, the "UC") was utilized to facilitate the purchase of heroin from Kristian Mena (hereinafter, "Mena"). As with each controlled purchase described in this affidavit, the UC was outfitted with audio and video recording equipment that was

monitored by a surveillance team, including DEA investigators. These audio and video recordings are preserved. All of the controlled purchases described in this affidavit were arranged via text messages, which are also preserved. On March 12, 2018, the UC text messaged (646) 427-1712 (hereinafter, "-1712"), used by Mena, in order to purchase 5 grams of heroin. Through a text conversation, the UC and Mena agreed to meet at an apartment complex, Avalon Bay, located at 460 River Road, Andover, MA (hereinafter, "Avalon Bay"). At Avalon Bay, the UC received a phone call from Mena, who was using -1712, that directed him to the Target Vehicle. The UC entered the rear passenger seat of the Target Vehicle, which was occupied by three Hispanic males. Through later review of Registry of Motor Vehicle images and demographic information, Mena was identified as the rear seat passenger and RODRIGUEZ was identified as the driver. An unknown male was in the front passenger seat. In the back seat, Mena removed a plastic bag of suspected heroin from his pocket and gave it to the UC in exchange for $200 of pre-recorded U.S. currency. After this transaction, the bag of suspected heroin was forwarded to the Massachusetts State Police Laboratory for analysis.

11.     On March 23, 2018, officers arranged a controlled purchase of 30 grams of fentanyl by contacting Mena at phone number (508) 557-2641 (hereinafter, "-2641"). Prior to the controlled purchase, investigators learned from the Registry of Motor Vehicles that Mena listed his residence as 63 Ferry Street #1, Lawrence, MA 01841. Prior to the controlled purchase, investigators observed Mena leave his house and drive to Avalon Bay in his own car. Surveillance was not continuously maintained on Mena due to his evasive driving.  The UC met Mena at Avalon Bay and approached the driver's side of Mena's car. The UC handed Mena $900 of pre-recorded U.S. currency. Mena, in exchange, handed a plastic bag of suspected fentanyl and a plastic bag of crack cocaine (approximately one gram) to the UC. After the transaction,

Mena texted the UC to contact him at a new phone number, (617) 669-0896 (hereinafter, "-0896"). After the transaction, investigators observed Mena meet with RODRIGUEZ, which is further discussed below. The bags of suspected fentanyl and suspected crack cocaine purchased by the UC were forwarded to the Massachusetts State Police Laboratory for analysis.

12.    After the controlled purchase on March 23, 2018, investigators maintained surveillance on Mena and observed him drive home. Investigators observed RODRIGUEZ in the Target Vehicle, parked outside of Mena's home when Mena arrived. Mena got out of his car and into the rear seat of the Target Vehicle. A third individual was already in the front passenger seat of the Target Vehicle. After less than one minute, Mena exited the Target Vehicle and went into his house. Officers maintained surveillance on RODRIGUEZ, who drove the Target Vehicle to an apartment complex in Methuen, where RODRIGUEZ went inside for one minute. When he returned to the Target Vehicle, RODRIGUEZ returned home to 20 Canton Street in Lawrence, the listed residence on RODRIGUEZ's driver's license and vehicle registration. Based on my training and experience, I believe that Mena gave RODRIGUEZ payment for the fentanyl that Mena had just sold to the UC.

13.    On April 4, 2018, the UC arranged to purchase 35 grams of suspected fentanyl from Mena. The UC contacted Mena's most recent phone number -0896, and arranged to meet Mena at Avalon Bay to conduct the transaction. Prior to the controlled purchase, investigators observed Mena leave his home in his car. He drove to RODRIGUEZ's home and RODRIGUEZ entered the front passenger seat of Mena's car. Mena and RODRIGUEZ drove to Avalon Bay in Mena's car. At Avalon Bay, the UC approached Mena from his driver's side window and handed Mena $900 of pre-recorded U.S. currency. Mena, in exchange, handed a plastic bag of suspected fentanyl to the UC. The suspected fentanyl was field tested using a TruNarc analyzer and tested

positive for fentanyl. The bag of suspected fentanyl purchased by the UC was forwarded to the DEA Lab for analysis.

**B.   Seizure of 150 Grams of Fentanyl from RODRIGUEZ outside of the Target Vehicle**

14.     On April 19, 2018 investigators worked with a confidential informant (hereinafter, the "CI") to arrange a purchase of fentanyl from RODRIGUEZ. Investigators have observed the CI selling narcotics on numerous occasions. The CI is cooperating with law enforcement with the hope of receiving consideration on his/her own criminal case(s). The CI has not previously cooperated with law enforcement. However, some information provided by the CI has been independently corroborated by investigators. Information by the CI is believe to be reliable.

15.     At the direction of investigators on April 19, 2018, the CI placed a recorded telephone call to RODRIGUEZ to arrange the purchase of 50 grams of fentanyl. RODRIGUEZ told the CI that he did not have 50 grams of fentanyl ready, but that he could arrange the purchase in less than an hour. After the transaction was arranged, investigators established surveillance on RODRIGUEZ's home. Approximately 15 minutes after the recorded phone call from the CI to RODRIGUEZ, investigators observed RODRIGUEZ leave home in the Target Vehicle and drive to a gas station. At the gas station, he picked up a man, later identified as Torres.  Simultaneously, the CI received a text message from RODRIGUEZ stating, "I'm getting it rn (right now)." From the gas station, investigators observed RODRIGUEZ drive to Torres's home, 19 Larchwood Road, Methuen, MA, in the Target Vehicle. In a subsequent query of Torres's Massachusetts Board of Probation record, Torres's residence is listed as 19 Larchwood Road in Methuen. Immediately after the Target Vehicle arrived at Torres's home, Torres got out

of the Target Vehicle and went inside the house. Simultaneously, the CI received a text message

from RODRIGUEZ stating, "I'm getting em. How much you got." The CI responded "940."

After less than one minute, Torres returned to the front passenger seat of the Target Vehicle.

After less than 30 seconds in the Target Vehicle, Torres got out of the Target Vehicle. Based on

my training and experience, I believe that Torres retrieved fentanyl from his house and

distributed it to RODRIGUEZ. RODRIGUEZ then left the area. Investigators maintained

surveillance of RODRIGUEZ and followed him back home. While RODRIGUEZ was driving

back home, the CI received a text message from RODRIGUEZ stating, "Pull up." The CI

understood this to mean to go to RODRIGUEZ's home. Once RODRIGUEZ pulled into the

driveway of his house, investigators approached the Target Vehicle at the same time

RODRIGUEZ was exiting the Target Vehicle. Officers conducted a search of RODRIGUEZ.

During the search of RODRIGUEZ, investigators located approximately 150 grams of suspected

fentanyl in a plastic bag on his person. The vehicle was towed and is held in DEA custody

pending the issuance of a search warrant.

16.     Based on the foregoing, I believe that RODRIGUEZ committed the Target

Offenses, and that he used the Target Vehicle in furtherance of his drug trafficking activity. As

mentioned above, the Registry of Motor Vehicle lists RODRIGUEZ as the registered owner of

the Target Vehicle, and investigators have observed him using the Target Vehicle numerous

times in furtherance of his drug trafficking activity.


**Drug Traffickers' Use of Vehicles and Cell Phones Generally**

17.     Based upon my experience and the experience of other law enforcement officers

who have participated in the execution of numerous search warrants at the residences of drug-

traffickers, I am aware that the following kinds of drug-related evidence have typically been

recovered during searches of drug-traffickers' vehicles:

   a. Illegal controlled substances, including but not limited to, fentanyl.

   b. Paraphernalia for packaging and distributing controlled substances, including but not limited to, plastic bags and scales.

   c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

   d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

   e. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

   f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

   g. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

   h. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

i.   Cellular telephones, and evidence that tends to identify the person having
dominion and control over the cellular telephone, such as electronic address books
or contact lists on the phone, call logs, saved text messages, saved usernames and
passwords and documents.

18.    Based upon my training and experience, as well as the training and experience of

other law enforcement agents I have worked with, I am aware that drug traffickers who use

motor vehicles in furtherance of their drug trafficking activities store the items described above

in their motor vehicles.  Drug traffickers typically do this because they use their vehicles as a

place of business both to receive and transport drugs and drug proceeds.  Additionally, because

motor vehicles are mobile, drug traffickers will often store sensitive materials relating to their

drug-trafficking activities in their vehicles (often in hidden compartments) so that those materials

can be transported quickly and without discovery, and can be discarded off-site if necessary.  As

discussed above, I believe that RODRIGUEZ has used the Target Vehicle in furtherance of the

Target Offenses to transport and receive drugs and that, as a result, the evidence set forth in

Attachment B are likely to be found in the Target Vehicle.

19.    I am aware that it is generally a common practice for drug traffickers to maintain

in their vehicles records relating to their drug trafficking activities.  Because drug traffickers in

many instances will "front" (that is, sell on consignment) controlled substances to their clients, or

alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is

necessary to keep track of amounts paid and owed, and such records will also be maintained

close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or

"pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments

expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug

traffickers must maintain telephone and address listings of clients and suppliers and keep them

immediately available in order to efficiently conduct their drug trafficking business.  I am also

10

aware that drug traffickers often maintain such documents related to their drug trafficking activities in their vehicles for an extended period of time, regardless of whether they are physically in possession of drugs at the time.

20.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions, records, and receipts relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in vehicles.

21.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash, drugs, and sensitive documents related to their drug trafficking and money laundering activities in hidden compartments or other containers so that other individuals who enter their vehicle do not discover these materials.

22.     During the course of vehicle searches, I and other agents have also found items of personal property that tend to identify the person(s) in control or ownership of the target vehicle. Evidence of lease agreements and/or ownership of the vehicle is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as vehicle registration documents, leases agreements, vehicle maintenance receipts, bank receipts, identification documents, and keys.  Furthermore, records of control or ownership linking a person to a particular vehicle is durable and are reasonably likely

to be maintained for long periods of time for several reasons, such as record keeping.  Many

documents and records are largely innocuous, or at least are perceived as such, while many

documents and records have other utility.  For example, a person involved in the trade of illegal

drug is unlikely to discard vehicle registration documents, lease agreements, vehicle maintenance

receipts, or bank receipts.  These are necessary to prove ownership, even if they are in the name

of a proxy.

23.     Based on training and experience, I know that most drug dealers regularly use

cellular telephones to communicate about their drug trafficking activities with customers,

suppliers, and other coconspirators.  As discussed above, the CI contacted RODRIGUEZ by

phone to arrange a purchase of drugs from him.  In my training and experience, I also am aware

that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus

frequently change cellular telephone numbers and/or use multiple cellular phones at the same

time, as well as prepaid cellular phones (where the subscriber of the phone is not required to

provide personal identifying information), in an effort to thwart law enforcement's use of

electronic surveillance.  Because cellular telephones are often a principal means of

communication, drug dealers typically keep the phones in close proximity or in their vehicles.

Additionally, in my experience, many drug dealers do not dispose of their cellular telephones

when getting a new number, but instead just discard them in various locations in their residences

or vehicles.  As a result, it is common to recover not only paper records pertaining to the use of a

cellular phone by drug dealers, such as bills, call detail records, statements, and other documents,

but the cellular telephones themselves, from drug dealers' vehicles.

24.     Based upon my knowledge, training and experience, I know that a cellular

telephone is a handheld wireless device used primarily for voice communication through radio

signals.  These telephones send signals through networks of transmitter/receivers called "cells,"

enabling communication with other wireless telephones or traditional "land line" telephones.  A

wireless telephone usually contains a "call log," which records the telephone number, date, and

time of calls made to and from the phone.  In addition to enabling voice communications,

wireless telephones now offer a broad range of capabilities.  These capabilities include, but are

not limited to: storing names and phone numbers in electronic "address books;" sending,

receiving, and storing text messages and email; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading information from

the Internet.  Wireless telephones may also include global positioning system ("GPS")

technology for determining the location of the device.  Based on my training and experience, I

know that many cellular telephones have the capabilities described above.

      25.     Seizure of devices containing this information will provide information relating to

coconspirators and accomplices.  I know, based upon my training and experience, as well as

consultation with other investigators, that individuals who sell illegal drugs typically use cellular

telephones to communicate with their suppliers, their customers, and with other coconspirators,

and that they communicate both via both voice calls and via email and/or text messaging.  I also

know that persons who sell illegal drugs regularly keep records of their illegal activities.  These

records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and

money owed by customers or to suppliers, and lists of quantities and/or specific controlled

substances preferred by or ordered by specific customers.  Individuals engaged in drug

trafficking activities often take photographs of their closest confederates.  Records of drug

trafficking activities can be produced and maintained on paper in a tangible form and/or by

electronic means on a cellular telephone.  From my training and experience, and information

provided to me by other agents, I am aware that individuals commonly store records of the type

described in Attachment B on their cellular telephones.

26.     Additionally, I know that many drug traffickers often use cellular telephones in

order to communicate quickly and economically with their suppliers and customers via the

internet.  I am also aware that individuals frequently use cellular telephones to create and store

records of their actions by communicating with others through e-mail, electronic messages, and

updates to online social-networking websites; keeping their calendars; arranging for travel;

storing pictures; researching topics related to drug trafficking; and accessing their bank,

financial, investment, utility, and other accounts online.  Additionally, many cellular phones

today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular

phone can provide valuable evidence as to the locations where drug traffickers meet with

coconspirators, including their sources of supply, and can aid in identifying those individuals.

Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers

store drugs, maintain bank accounts, and conceal their drug proceeds.

27.     Based upon my training and experience, and information provided to me by

others involved in the forensic examination of computers, I know that electronic data on cellular

telephones can be stored in a variety of methods, including, but not limited to, within the

memory of the cellular telephone; within volatile memory, such as RAM; or on removable

media, such as memory cards.  I also know that electronic data can often be recovered months or

even years after it has been written, downloaded, saved, deleted, or viewed locally or over the

internet.  This is true because:

     a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their

electronic equipment, they can easily transfer the data from their old device to a new one.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

28.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the Target Vehicle.

## CONCLUSION

29.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that within the Target Vehicle, as described in Attachment A, there exist evidence, fruits, and instrumentalities of RODRIGUEZ's drug distribution activities as set forth in Attachment B. Accordingly, I respectfully request that a search warrant be issued for the search of the vehicle described in Attachment A for the items detailed in Attachment B.

_____
Michael Lane
Task Force Officer
Drug Enforcement Administration


SIGNED and SWORN to before me this 24th day of April 2018.

_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts

## ATTACHMENT A

### 2001 MERCEDES C240

The vehicle is a red 2001 Mercedes C240 with Massachusetts registration 9BWY10, registered to Carlos RODRIGUEZ of 20 Canton Street, Lawrence, MA, with VIN #WDBRF61JX1F019541. The vehicle is currently in the custody of the DEA at Sheehan's Towing at 9 Merrimack Street, Lawrence, MA. Further, all cellular telephones located in the Target Vehicle.

**ATTACHMENT B**

**(Items to be Seized from Vehicle)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1.  Illegal controlled substances, including but not limited to, fentanyl.

2.  Paraphernalia for packaging and distributing controlled substances, including but not limited to, plastic bags and scales.

3.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

5.  Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

6.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

8. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

9. Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a.   Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b.   Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.   Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d.   Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e.   GPS data;

   f.   Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g.   Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i.   Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

19